IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF TENNESSEE (KNOXVILLE)

| | |
|---|---|
| JOSEPH CAMPANINI,<br><br>                      Plaintiff,<br>vs.<br><br>STUDSVIK, INC.<br><br>                      Defendant. | FINDINGS OF FACT<br>AND CONCLUSIONS OF LAW<br><br>Civil No. 3:09 CV 201<br>(Campbell/Shirley) |

      Joseph Campanini brought this diversity action against his former employer Studsvik, Inc.[1] claiming that Studsvik breached its contract with him because it failed to pay him the full amount of a commission he had earned. Mr. Campanini also brought a claim for violation of the Pennsylvania Wage Payment and Collection Law. The court held a bench trial on September 6, 2012.

      For the reasons described below, the court finds that Studsvik did not breach its contract with Mr. Campanini and did not violate the Pennsylvania Wage Payment and Collection Law.

**FINDINGS OF FACT**

      From 2002 to 2006, Mr. Campanini worked for Radiological Assistance Consulting and Engineering, LLC (RACE) (the predecessor to Studsvik) selling radioactive waste processing

---

[1] Radiological Assistance Consulting and Engineering, LLC (RACE) was the actual entity that employed Mr. Campanini and allegedly failed to pay him the full commission. Studsvik, Inc. is in this lawsuit because it acquired all of RACE's assets and obligations in 2006.

services in the nuclear power plant industry. (Mr. Campanini had worked in the industry for many years.) RACE and Mr. Campanini signed an employment agreement in February 2002. (Ex. 5.) In the agreement, Race agreed to pay Mr. Campanini 5% of all gross sales he made. (Id. ¶ 4(a).) In 2004, RACE and Mr. Campanini entered into a second agreement. (Ex 6.) The 2004 agreement was similar to the 2002 agreement except that it required Mr. Campanini to pay a percentage of any commission he earned to the project manager. (Id. ¶ 4.)

Gerald Webb, the president of RACE and the person who hired Mr. Campanini, described Mr. Campanini's responsibilities as a sales consultant:

> Just generally speaking, he would harvest leads; bring them in-house; aid us in determining their market value, and that being, you know, what the customer was willing to pay, what the market would bear; help us construct an offer that would be viewed favorably in the eyes of the recipient; and then in turn deliver the offer; follow up on the offer; and aid in closing the sale in terms of having a contract signed. And perhaps lastly, liaison to internal persons who would manage the work through completion, aid in transitioning those people, liaison efforts and so forth with the customer. Follow the work through, of course, somewhat indirectly.

(Dep. of William M. "Gerald" Webb 30-31.)[2]

At trial, Mr. Campanini articulated his view of his role at RACE: "I would identify a prospect, bring that potential prospect back to Gerald . . . . We would discuss an opportunity. . . . I would also provide a solution . . . ." (Sept. 6, 2012 Trial Transcript (Tr.) 49-50.) Mr. Campanini was not involved in deciding pricing or other terms of a contract. (Id. 49, 51.)

RACE's manager of sales for commercial operations and jobs, James Gibson, testified

---

[2]Mr. Webb was not available at trial as a witness, so the parties submitted his deposition testimony in lieu of trial testimony.

that a salesman, like Mr. Campanini, did not "generate a proposal," but the salesman had to "develop it. He had to bring in the sale." (Dep. of James B. Gibson 22.)[3]

Mr. Campanini was successful while working at RACE. Mr. Webb characterized Mr. Campanini as "probably one of our top sales guys." (Webb Dep. 26.)

The Connecticut Yankee Project

Connecticut Yankee (CY) was a nuclear power plant located in Haddam Neck, New Jersey. The entire plant was being "decommissioned," which in the nuclear power plant industry means the total dismantling of a nuclear power plant and removal of all radioactive material.

At the time RACE received the contract to finish[4] the CY decommissioning project, Todd Smith was the executive director of business operations at CY. Mr. Smith played a lead role in the decommissioning project: "My responsibility was to come up with a strategy, work with a team, of course, and come up with a strategy as to how we decommission Connecticut Yankee within the monetary guidelines we were given." (Tr. 205- 06.)

The Meeting with Jim Nugent

According to Mr. Campanini, in 2003, he met with Jim Nugent, a long-time colleague in the nuclear waste industry, at a restaurant near the CY plant. Mr. Nugent was to be the

---

[3]Mr. Gibson was also not available to be a witness at trial, so the parties submitted the transcript of his deposition instead.

[4]Another company had initially received the contract to carry out the decommissioning of CY. When CY was not happy with that company's work, CY ended the contract.

operations manager at CY. Mr. Campanini told him his plan for how RACE could effectively and economically perform the radioactive waste processing services for the decommissioning of CY. (Mr. Campanini testified that several years before he went to work for RACE, he had conceived this plan while employed by another nuclear waste processing company, Allied Technology Group.) Mr. Campanini testified that after his conversation with Mr. Nugent, he and Mr. Webb talked about the conversation with Mr. Nugent, the possibility of RACE's securing the CY contract, and, in general, the strategy RACE should follow to get the job.

In his deposition, Mr. Webb was not specifically asked whether he and Mr. Campanini had the conversation Mr. Campanini had described. But when questioned whether he knew of any "communication" Mr. Campanini had with people associated with the CY decommissioning project, Mr. Webb answered: "He had, to my knowledge, some dialogue with Jim Nugent, who was a contractor for Connecticut Yankee. I don't believe he had any communication at all with Todd Smith or Wayne Norton [the president of CY]." (Webb Dep. 51.) He also testified that he did not "believe he [Mr. Campanini] had much of a role at all in obtaining the contract. The only credit I would give him to that is he had a historical relationship with Jim Nugent and they may have had discussions about it that I wasn't aware of." (Id.)

Mr. Nugent did not remember much about the events leading up to the awarding of the contract to RACE although he did recall that he had spoken with Mr. Campanini. He testified that he couldn't remember any details of the conversation, but that Mr. Campanini had asked him what RACE could do to "help" CY in the decommissioning project. (Nugent Dep. 28.)

The Tucson Conference

The waste management industry conference holds an annual conference in Tucson, Arizona. In February 2004, Mr. Smith and the president of CY, Wayne Norton, went to the Tucson conference "to find a company in Tennessee that, number one, possessed a license to dispose of waste in the various landfills in Tennessee, and, number two, that might have the ability to handle at the time we were thinking around a hundred million pounds of waste."[5] (Tr. 212 (Smith).)

Mr. Smith testified that he and Mr. Norton stopped by the RACE booth as part of their search for a waste disposal company that could handle the CY decommissioning project. James Gibson was working in the RACE booth at the time. Mr. Smith emphasized that the visit to the RACE booth was not the result of a "planned liaison with the principals of RACE." (Id. 217.) Mr. Smith described his meeting with Mr. Gibson at the booth: "We kind of just walked up and said can you handle a hundred million pounds of waste. Kind of got the deer in the headlight look from Mr. Gibson, which is not unusual. I don't think many people get asked that question." (Id. 216.) Then, as Mr. Smith remembered the meeting, he and Mr. Norton told Mr. Gibson that they would "take a walk around the booth, around the rest of the convention and we'll circle back around and see you. When we did, on the back of a business card he laid out a little tiered pricing structure as to how RACE might be able to handle Connecticut Yankee's quantities based

---

[5]Mr. Smith's goal was to avoid sending the waste to Utah (another repository for nuclear waste that he had used in the past) which would have been more expensive than using a Tennessee waste disposal company.

5

on a tiered pricing structure which looked to be very very favorable to Connecticut Yankee." (Id. 216-17.) Neither Mr. Campanini nor Mr. Nugent was present at the meeting at the RACE booth.

Mr. Norton and Mr. Smith were interested in the RACE proposal because of the "favorable" pricing. After several meetings, CY and RACE reached an agreement, and RACE received the contract for the decommissioning project in April 2004. Mr. Campanini did not attend any of the meetings. Mr. Smith testified that Mr. Campanini was not involved in the decision to enter into the contract. In fact, Mr. Smith did not meet Mr. Campanini until July 2004 at a baseball game.

The testimony of James Gibson corroborates Mr. Smith's recollection of the Tucson meeting.[6] (Gibson Dep. 31.) Mr. Gibson described Gerald Webb's reaction after Mr. Smith and Mr. Norton visited the RACE booth:

> And Gerald turned to me after they left, and he said, "If you get that contract"– you know, I was not working for a commission – he said, "I'll send you and your family to Hawaii for free." Well, I should have got it in writing because I got nothing. Because I knew Todd [Smith], he [Mr. Webb] basically said, "You're the manager of getting that contract." So I started working from then on with Todd.

(Id.) When asked about Mr. Campanini's involvement in the CY project, Mr. Gibson answered:

> Well, the only involvement I knew of was his periodic golf outings or dinners with Jim Nugent who was working there at the plant, and he would feed back whatever information he got from talking to Jim. He really had no official involvement that I knew of. I mean, he didn't have any assigned responsibilities or duties, not to my knowledge.

---

[6]Mr. Gibson worked for RACE from 2004 until 2006. He testified that at his insistence, he was paid a salary rather than receiving commissions. In 2006, RACE ended his employment.

(Id. 35.)

### Mr. Campanini's Commission on the CY Project

RACE paid Mr. Campanini a commission of 0.8 percent on the CY project. Mr. Campanini testified that he never understood why he was paid that amount instead of the full commission. Mr. Webb, who had full control over who was or was not paid a commission, testified that he made the decision to pay Mr. Campanini the 0.8 percent commission. He was unable to explain how he had arrived at the number. (Webb Dep. 53-54.) In an answer to an interrogatory, Studsvik answered that Mr. Campanini "was offered a special compensation arrangement to reward him for his ongoing maintenance of this account." (Id. 79.)

According to Mr. Gibson, shortly after RACE got the CY decommissioning project, he and Gerald Webb talked about Mr. Gibson receiving a commission for the CY project:

> Well, immediately after getting this contract for $20 million, which would have amounted to at five percent $1 million to me, Gerald one day just says, "Okay, you're working on commission now." And at that point in time we had yet to do any work on this contract. We had just gotten the contract.
>
> So I said, "Well, that means I get part of this commission because, you know, I got the contract, we have yet to do the work." And the way the commission was paid, it was paid based on them processing waste. In other words, you just didn't get a contract for $20 million, and they forked over five percent. It was based on actual revenue. So Gerald says, "No, you were working under a different arrangement then, so you got nothing."

(Gibson Dep. 36-37.)

Mr. Gibson was angry because he didn't receive any commission for bringing in the CY project:

> I wrote him [Mr. Webb] e-mails and things saying, "Look, this is not fair.

7

> I get the biggest job you've ever had, and you screw me over here, and I don't understand it." And he never replied. And I also asked him, "What happened to that trip you promised me to Hawaii." He says, "Oh, that was just a figure of speech." And I said, "Excuse me, I don't understand that."

(Id. 41.)

<u>Mr. Campanini Has Not Proved That He "Brought in" the CY Contract</u>.

Mr. Gibson testified that he was the salesperson who was responsible for RACE getting the CY contract: "I brought in the Connecticut Yankee contract, which was worth $20 million to them. And it made it possible for Gerald and Bob Applebaum to turn around and sell the company to Studsvik." (Id. 16.)

Although he testified only through deposition, the court found Mr. Gibson's testimony credible for several reasons. First, Mr. Gibson had no incentive to slant his testimony in favor of Gerald Webb, RACE, or Studsvik. RACE had terminated his employment without explanation and Mr. Webb refused to pay him any compensation for the CY project. Second, his testimony was corroborated by that of Todd Smith. Mr. Smith was also a credible witness. He is not employed by Studsvik, and his company, TSSD, does not provide any services to Studsvik.

Mr. Smith and Mr. Gibson both testified that the meeting between RACE and CY at the Tucson conference was not prearranged. They confirmed that neither Mr. Nugent nor Mr. Campanini was involved in the meetings which ultimately culminated in CY giving the decommissioning project to RACE.

Mr. Campanini did not raise the question of being owed a commission until he filed this lawsuit in 2008. He testified that he was afraid that if he did, he would be fired. He testified, "I

8

had so much going on I didn't want to jeopardize my other commissions. I had a family of three. I went through some difficult times six or seven years prior. I was pulling my family out of the financial hardships that we had. I didn't want to jeopardize where I was." (Tr. 96.)

## CONCLUSIONS OF LAW

The court has diversity jurisdiction over this lawsuit. There is complete diversity between the parties and the amount in controversy exceeds $75,000.

Mr. Campanini bore the burden to prove by a preponderance of the evidence that Studsvik breached its agreement with him when it failed to pay him a full commission for the CY project. He has not met this burden.

The relevant language of the 2002 Agreement[7] offers little guidance in this dispute: "The Sales Consultant shall be employed in the capacity of a Sales Consultant and shall be responsible for the following duties and responsibilities: (a) to sell dry radioactive waste processing services within the specified and agreed areas clients in which Sales Consultant is to sell services and to promptly forward all leads and secured orders to the Company; . . . . " (Ex. 5 ¶ 2(a).)

The 2004 Agreement is similarly vague. Mr. Campanini's duties are defined as: "(a) to sell the Company's services as defined by the Director of Business Services and/or the designated Department Head within the assigned area (the 'Territory') and to promptly forward all leads and secured orders to the Company." (Ex. 6 ¶ 2(a).)

---

[7]The 2002 Agreement was the first agreement signed by Mr. Campanini. Shortly before CY and RACE entered into their contract, he signed the 2004 Agreement. Neither party has fully addressed which agreement governs this dispute but, because the court has concluded that Studsvik did not breach either agreement, the court will not decide the issue.

9

Mr. Webb had the final authority to decide who had made a sale and earned a commission.

The court concludes that Mr. Gibson actually made the sale that resulted in RACE getting the CY contract. Although Mr. Campanini had some role, as shown by RACE's payment of a 0.8 percent commission to him, the testimony of Mr. Gibson that a salesman had to develop and "bring in the sale" (Gibson Dep. 22) was persuasive. The evidence did not establish that Mr. Campanini was responsible for Mr. Norton and Mr. Smith visiting the RACE booth at the Tucson Conference nor did it establish that either Mr. Campanini or his ideas were significant in RACE getting the CY contract. Rather, the evidence made clear that Mr. Gibson was the salesman responsible for bringing in the CY sale.

Studsvik did not breach its agreement with Mr. Campanini and it does not owe him any additional commission for the CY project. Mr. Campanini's claim under the Pennsylvania Wage Payment and Collection Law also fails because the statute does not itself create a right of compensation but is a statutory remedy when an employer breaches a contractual obligation to pay wages and fringe benefits. Weldon v. Kraft, Inc., 896 F.2d 793, 801 (3rd Cir. 1990).

**ORDER**

1. Plaintiff Joseph Campanini's remaining claims against Defendant Studsvik, Inc. are dismissed with prejudice.

2. Studsvik, Inc. seeks attorneys' fees and costs. The court will consider the request, but Studsvik must submit, no later than two weeks from the date of this order, a written brief articulating the legal basis for such an award of attorneys' fees and costs, accompanied by

documentation of the fees and costs themselves (in the form of affidavits and other relevant exhibits). Mr. Campanini may file a response to the claim no later than two weeks after Studsvik files its brief and documentation with the court.

SO ORDERED this 22nd day of February, 2013.


BY THE COURT:

*Tena Campbell*
TENA CAMPBELL
United States District Court Judge